## UTAH JUNK CO. *v.* PORTER, PRICE ADMINISTRATOR.

No. 400.   Argued February 26, 1946.—Decided April 22, 1946.

*Keith L. Seegmiller* submitted on brief for petitioner.

*Richard H. Field* argued the cause for respondent. With him on the brief were *Solicitor General McGrath, John R. Benney* and *Jacob D. Hyman.*

Mr. Justice Frankfurter delivered the opinion of the Court.

This is one of a series of cases calling for the construction of amendments to the Emergency Price Control Act of 1942.

Section 203 of that Act, 56 Stat. 23, 31; 50 U. S. C. App. § 923, confined within narrow limits the right to protest to the Administrator against a price schedule promulgated by him. The Stabilization Act of 1944, 58 Stat. 632, 638; 50 U. S. C. App. § 923, greatly liberalized this right to protest. The view taken by the United States Emergency Court of Appeals of the scope of this liberalization, 150 F. 2d 963, based on its prior ruling in *Thomas Paper Stock Co.* v. *Bowles,* 148 F. 2d 831, led us to bring the case here. 326 U. S. 710.

The facts relevant to the immediate issue can be quickly stated. The Administrator established maximum prices for iron and steel scrap. Revised Price Schedule No. 4, 7 Fed. Reg. 1207 (February 21, 1942). This schedule, § 1304.13 (f), *id.* at 1212, made no special provision for smelter fluxing scrap, scrap prepared for use in lead blast furnaces. Petitioner, a scrap dealer, operating in Utah, was engaged in the preparation and sale of fluxing scrap. Between April 25, 1942, and February 10, 1943, it sold a considerable amount of fluxing scrap to one of its customers, for which it was to be paid, in addition to the ceiling price for the scrap, $1.50 per ton for preparing the scrap. Inasmuch as the petitioner had been notified by the Office of Price Administration that such a charge was a violation of the price schedule, it merely billed its customer for the additional $1.50 per ton but abstained from collecting it, so as to avoid the penal provisions of the Price Control Act.

The controversy concerns petitioner's lawful right to collect this processing charge as previously agreed upon

between the parties to the contract. Claiming that the price schedule governing the sales in question was invalid insofar as it failed to permit an allowance for processing, petitioners filed a protest with the Administrator. The Administrator and the Emergency Court of Appeals ruled that the protest came too late. It was timely, in any event, only if the amendment to § 203 (a) of the Price Control Act of 1942 made by § 106 of the Stabilization Act of 1944, 58 Stat. 632, 638, can be invoked after the ground of objection to a price schedule had been prospectively removed.[1] For the Administrator had completely met petitioner's objection by the time that the petitioner could avail itself of whatever enlarged right of protest the 1944 amendments conferred. The Administrator did so, in part, on December 21, 1943, by authorizing a Regional Office of the Price Administration to grant upon application an allowance of up to $1.50 per ton for processing scrap; and on June 30, 1944, the very day that the Act of 1944 became effective, the schedule was revised to permit such a charge on all future sales of scrap. 9 Fed. Reg. 7330.

---

[1] § 203 (a) reads as follows; the bracketed material was deleted by the 1944 amendment, the italicized material added by that amendment: "[Within a period of sixty days] *At any time* after the issuance of any regulation or order under section 2, or in the case of a price schedule, [within a period of sixty days] *at any time* after the effective date thereof specified in section 206, any person subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest specifically setting forth objections to any such provision and affidavits or other written evidence in support of such objections. [At any time after the expiration of such sixty days any person subject to any provision of such regulation, order, or price schedule may file such a protest based solely on grounds arising after the expiration of such sixty days.]" 56 Stat. 23, 31; 58 Stat. 632, 638; 50 U. S. C. App. § 923 (a).

This brings us to the controlling legislation. The procedure established by the Emergency Price Control Act of 1942 authorized "any person subject to any provision" of a price schedule issued by the Administrator to "file a protest specifically setting forth objections to any such provision," with a right of appeal to the Emergency Court of Appeals from denial of such protest by the Administrator. §§ 203 (a) and 204 (a), 56 Stat. 23, 31. But such protest had to be made "within a period of sixty days after the effective date" of a price schedule. By the Stabilization Act of June 30, 1944, 58 Stat. 632, 638, Congress amended the procedure so that a protest against any provision of a price schedule could be filed "at any time" after the effective date.

If one had only the words of the 1944 amendment to go on, it would be dubious to infer that Congress had not only removed the bar of sixty days for protests to which the future may give rise but had also revived a right of protest which had expired through non-user under the Act of 1942. But such, it appears, is the meaning of the amendment. On this point the legislative history is decisive. A Senate report furnishes an authoritative gloss: "The committee was concerned . . . by the fact that in the early days of price control many people unfamiliar with the provisions of the act might have lost their right to challenge the basic validity of a regulation by excusable failures to file a protest within the statutory period. The committee therefore recommends that with respect to all regulations issued before July 1, 1944, a new period of 60 days from that date be provided for the filing of protests. . . ." S. Rep. No. 922, 78th Cong., 2d Sess. (1944) 10. It will be noted that the Senate proposed a reviver of barred claims for only sixty days. Even this limitation was removed when the measure was amended by the House

and subsequently became law. See H. R. Rep. No. 1593, 78th Cong., 2d Sess. (1944) 5; H. R. Rep. 1698, 78th Cong., 2d Sess. (1944) 21.

Congress was evidently impressed by the need for relief of rights lost through what it deemed excusable failure to enforce them under the original Price Control Act. Since, then, Congress lifted the sixty-day limitation retrospectively, we are relieved from considering whether, in the circumstances of this case, petitioner's right of protest would have been barred even under the 1942 Act so long as the controverted price schedule remained unmodified.[2] But this takes us only part of the way. We need still ascertain whether the 1944 amendment authorizes a protest without a time limit only against a price schedule contemporaneously active. Does it, that is, preclude a right of protest like petitioner's against a schedule that had been superseded, although it continues to govern the validity of transactions that occurred under its rule?

The Administrator argues that this restriction upon the enlargement of the right of protest made by the Act of 1944 is immanent in what Congress said. This is what Congress said: "At any time after the issuance of any regulation or order . . ., or in the case of a price schedule, at any time after the effective date thereof . . . any per-

---

[2] The price schedule in controversy was reissued on February 21, 1942, 7 Fed. Reg. 1207, and the sixty days for protest, under the 1942 Act, expired on April 21, 1942. But it was not until April 25, 1942, that petitioner was notified by the O. P. A. that the schedule applied to its sales of fluxing scrap. Under the original Act, the sixty-day limitation did not apply to "a protest based solely on grounds arising after the expiration of such sixty days." We need not decide whether petitioner could have brought itself under this escape clause. See *Galban Lobo Co.* v. *Henderson,* 132 F. 2d 150; *United States Gypsum Co.* v. *Brown,* 137 F. 2d 803; *R. E. Schanzer, Inc.* v. *Bowles,* 141 F. 2d 262; *Marlene Linens* v. *Bowles,* 144 F. 2d 874.

son subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest . . ." We find nothing in this language of the 1944 amendment of § 203 (a), or in its history, or in any illumination otherwise shed upon the terms of this legislation, to justify reading in a qualification that Congress has left out.

All construction is the ascertainment of meaning. And literalness may strangle meaning. But in construing a definite procedural provision we do well to stick close to the text and not import argumentative qualifications from broad, unexpressed claims of policy. Insofar as such considerations are relevant here, however, they tell against cutting down the natural meaning of the language Congress chose.

Congress liberalized the right to challenge the validity of price regulations so extensively as it did, even reviving rights theretofore lapsed, because it felt, as we have seen, that rights were unfairly lost through unfamiliarity with the technical requirements of emergency legislation. Price-fixing is not static; it is a continuing process. The considerations of fairness that led Congress to give relief are the same whether a regulation was revised or remained unchanged. There is not a hint that Congress intended to draw a line so artificial as the one the Administrator would have us draw.

This conclusion is left undisturbed by the arguments advanced on behalf of the Administrator. It is urged that he ought not to be burdened with issues arising under superseded regulations. But as a matter of law enforcement a regulation continues to survive its supersession as a contemporaneous price schedule. *United States* v. *Hark,* 320 U. S. 531. The Administrator has the duty of enforcing the Act, and in a proceeding for suspension of a license

or for treble damages or penalties, it is immaterial that the basis of the suit is violation of a superseded price regulation. It is also suggested that the protest proceedings under § 203 (a) as amended are not available to a protestant in petitioner's plight because the validity of the old schedule may be otherwise tested. The only other way implies the readiness of the customer to pay the contract price for the processing charge and its acceptance by the petitioner, subjecting both to civil and criminal actions for violations of the Act. With the consent of the trial court, the Emergency Court of Appeals could then pass on the schedule. § 204 (e), 58 Stat. 632, 639; 50 U. S. C. App. § 924 (e). It surely does not commend itself to good sense to bar a direct protest to the Administrator so easily justified by an unstrained reading of the Act, because leave might be obtained to litigate the issue in a roundabout way, involving violations of a presumptively valid regulation. And in the event that the Administrator's insistence on the validity of the old maximum scrap price schedule is not challenged by violation, it could not be tested by bringing a suit on the contract for the additional price. *Yakus* v. *United States,* 321 U. S. 414.

Finally, apart from a construction of the statute which we are bound to reject, the Administrator seeks to invoke "the general doctrine of laches" against the petitioner, upon the particular facts of this case. The Emergency Court of Appeals may consider that issue when, upon remand, it disposes of this case in conformity with this opinion.

*Judgment reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.